## Peffer v. G. C. Murphy Co.

*Paul J. Smith*, for plaintiff.
*Metzger, Wickersham & Knauss*, for defendant.

KREIDER, J., January 5, 1959.—This matter comes before the court on defendant's motion for a new trial. A motion for judgment n. o. v. was abandoned. The jury returned a verdict in favor of Allen Peffer, the minor-plaintiff, for $14,900 and $5,200 for his widowed mother in her own right. Their respective claims for damages arose out of an accident which occurred when the minor's right hand was caught in the escalator maintained in defendant's store and as a result thereof the index, third and fourth fingers had to be amputated at the third joint. The minor was four years and 11 months old at the time of the accident and was accompanied by an 11-year-old boy.

Plaintiffs based their claim on two theories of negligence. First, that defendant company violated its duty to the minor in failing to operate and maintain its escalator with the high degree of care required for devices transporting the general public, and second, that defendant by its employes, agents and servants, failed to stop the moving escalator within a reasonable time after it had notice that the minor's fingers were caught therein.

Defendant company contends that it was not negligent in any degree and that it is not liable in damages to either of plaintiffs for the reason that the minor was a trespasser on its premises. Defendant further contends that the trial court erred in permitting the introduction of evidence of prior accidents on the escalator in question and in permitting plaintiffs to show that later and improved escalators were manufactured by the Otis Elevator Company, which had manufactured and installed defendant's escalator, and that some escalators of the newer type were used extensively in Pennsylvania, including two stores in the City of Harrisburg.

## Questions Involved

Defendant's counsel at the argument raised the following questions:[1]

I. Was the minor child a trespasser: (a) When he entered defendant's store unaccompanied by an adult; (b) if not a trespasser at that time, did he become a trespasser thereafter when he sat down on the escalator?

II. Should evidence have been admitted of prior accidents to children on the escalator in question?

III. Should the court have admitted evidence of the use of newer and improved model escalators in other stores in Harrisburg and elsewhere?

IV. Should the witness Wolfe have been permitted to testify as to the cost of remodeling the escalator?

## Discussion

On November 17, 1954, about 1 p.m., Allen Peffer, the minor-plaintiff, then four years and 11 months old, as above stated, and a companion, Robert Aungst, 11 years of age, walked about 16 blocks from Allen's home on Kelker Street to the G. C. Murphy Company department store on Market Street in the City of Harrisburg. Robert Aungst testified: "We went in Murphy's down town. We went in Murphy's to look at the toys. . . . Down in the basement." He said he wanted to look for some Christmas toys for his sister and that he saw powder and perfume which he had been looking for. Robert's sisters were 8, 11 and 14 years old, and Allen had visited defendant's store on previous occasions when his mother was shopping there.

After leaving the basement the boys proceeded to the first floor where they went on the escalator operat-

---

[1] The other reasons in the motion for a new trial were not pressed. Mr. Knauss, of counsel for defendant, subsequently advised the court they could be considered as withdrawn.

ing between the first and second floors. Allen sat down with his back toward the second floor and at a point where the moving steps of the escalator were close to the landing on the second floor, with his right hand resting on the escalator step. As the step moved under the comb plate at the exit platform, the three middle fingers of Allen's right hand were drawn into the aperture between the bottom of the said comb plate and the top of the moving treads of the step. Although Allen began to scream immediately, plaintiffs contend that defendant company's employes failed to stop the escalator and extricate his hand within a reasonable length of time after his screams were heard. One of the witnesses for plaintiffs, Eleanor Fishinger, testified that she heard Allen scream when she was 25 feet away from him, at which time he was in a sitting position on the escalator facing the first floor and that five or six minutes elapsed before anybody did anything. Defendant's witnesses, on the other hand, contradicted Miss Fishinger's testimony and testified that the escalator was stopped by defendant's employes within 15 seconds to one and one half or two minutes after the child's screams were heard.

There was testimony that defendant's escalator was installed April 1, 1939, and was continuously in use to the time of the accident on November 17, 1954. There was further evidence that at the time of the accident this escalator was in a good state of repair and had been approved by the chief inspector of elevators and escalators for the Department of Labor and Industry of the Commonwealth of Pennsylvania. Plaintiffs, however, offered evidence that as early as 1942 a newer and improved type escalator, known as the "R-32" model was available in which the open space between the top of the ascending stairway and the bottom of the escalator comb plate at the floor landing

was substantially reduced, thus making it practically impossible for children's fingers to become drawn into that aperture.

In 1942 defendant company had notice of the availability of the new R-32 model but never installed it or remodeled its escalator. *Four accidents similar in nature* to that sustained by the minor-plaintiff occurred on the "M L" escalator in question *prior to the accident in which the minor-plaintiff, Allen Peffer, was injured.* The accident immediately preceding the one in the instant case occurred on November 5, 1952. In that case three fingers of the left hand of Michael Fitzgerald, a four-year-old boy, were caught in defendant's escalator and were so badly mangled that they had to be amputated. Defendant unquestionably had notice of this accident because suit was brought against it and the case was tried before the writer of this opinion. See Fenstermacher v. G. C. Murphy Company, 271, September term, 1954.

I. *Was the minor-plaintiff a trespasser?*

Defendant, Murphy Company, contends that the minor-plaintiff was a trespasser when he entered the store and, if not at that time, he became such when he sat down on the moving escalator, and therefore neither the child nor its mother can recover damages. We cannot agree. We think that defendant invited the general public, including children, to its store and cannot be heard to say that under the circumstances in this case that the minor was a "trespasser". The Harrisburg store in defendant's chain caters to the general public and offers a wide variety of merchandise ranging from "5 and 10 cent store" items to others which are somewhat higher in price. There can be no dispute that in its stock of merchandise there are many articles of interest to children. We fail to see how a boy four years and 11 months old can be deemed in

law to be a "trespasser" when he accompanies an 11-year-old boy to inspect toys and to look around for a Christmas gift for the latter's sister about a week before the formal beginning of the yuletide gift purchasing period.[2]

Defendant frankly states it can find no authority to sustain its contention that Allen was a trespasser except the English case of Hardy v. Central London Railway Co. (1920), 3 KB 459, 11 BRC 207-CA, which is noted in 152 A. L. R. 570. There it was held that a boy five and one half years old was a trespasser in defendant's railway station and could not recover damages for injuries sustained when his hand was caught in an escalator, it appearing that the boys with whom he was playing and by one of whom he was brought to the subway station had been *repeatedly warned* by the railway company's employes to keep away and *had been chased off by a company policeman* half an hour *before* plaintiff received his injury. The appellate court held that plaintiff was a trespasser rather than a licensee. It is obvious that the facts in the London Railway Company case are readily distinguishable from those in the case at bar. There is no evidence in the instant case that children unaccompanied by adults were warned by defendant Murphy Company's employes to keep away from the store or that unaccompanied children had been chased off the premises.

In the A. L. I. Restatement of the Law of Torts §332, Comment (c), it is stated:

---

[2] In the Harrisburg area, the public is urged to do its Christmas shopping early. On the day after Thanksgiving the merchants, as in various other cities, sponsor a huge "Toy-Balloon" parade which is of special interest to children. Large crowds of children and adults are attracted and many of them enter the stores after the parade.

"It is not necessary that the visitor's purpose be to enter into immediate business dealings with the possessor. The benefit to the possessor may be indirect and in the future. Thus, *those who enter a shop* with no present purpose of buying but *merely to look at the goods* displayed *are business visitors* of the shop. So, too, where the shopkeeper permits his shop to be used as a short cut between two streets, those so using it are business visitors of the shopkeeper. In both cases the chance that the visitor, who comes out of mere curiosity or to save time, may see some article which he may stop or return to purchase is of sufficient advertising benefit to the shopkeeper to make the visit connected with his business." (Italics supplied.)

As applied to stores our Supreme Court has said that the duty of care to a business visitor is owed where one comes into the store for the purpose of *inspecting* or purchasing goods offered for sale: Markman v. Fred P. Bell Stores Co., 285 Pa. 378, 382 (1926). In Connelly v. Kaufmann and Baer Company, 349 Pa. 261, 265, 37 A 2d 125, a frequently cited case, it was held that a mother and her child, three years and two months old, were "business visitors." Having gone to defendant's store to inspect merchandise, the minor-plaintiff, Allen Peffer, was a business visitor as a matter of law under the doctrine of the Markman and Connelly cases and the A. L. I. Restatement of the Law of Torts §332(c), supra.

Plaintiff's first theory of negligence, as stated, was that defendant company violated its common carrier duty to the minor-plaintiff. It was not disputed that the accident occured while Allen was a passenger on the escalator. Therefore, a carrier-passenger relationship existed with a high degree of care owned by the operator of the escalator to all persons riding on it: Petrie v. Kaufmann and Baer Co., 291 Pa. 211, 213,

214 (1927); Connelly v. Kaufmann and Baer Company, 349 Pa. 261 (1944), supra. Mr. Justice Walling in the Petrie case defined this duty of care as follows, page 213:

"As an escalator and an elevator perform the like services of conveying people from one elevation to another, they are subject to like duties and responsibilities. The passenger is at least as powerless to influence the action of the former as the latter. *Hence, the rule that an elevator is deemed a common carrier applies equally to an escalator.* While a carrier is not an insurer of the safety of the passengers, *he is bound to exercise the highest practical degree of care for their safety,* and where a passenger is injured through some defect in the means of transportation or the manner of operation, the burden is upon the carrier to show it could not have been prevented by human foresight. 'But though in legal contemplation, they [common carriers] do not warrant the absolute safety of their passengers, they are yet *bound to excerise the utmost degree of diligence and care.* The slightest neglect against which human prudence and foresight may guard, and by which hurt or loss is occasioned, will render them liable to answer in damages. . . .' " (Italics supplied.)

The breach of defendant's duty "to exercise the highest practical degree of care" is disclosed by the evidence. Plaintiffs showed that "human prudence and foresight" could have minimized or eradicated the danger of injury. It was shown that defendant knew the aperture between the bottom of the stationary comb plate at the floor landing and the top of the moving treads of the escalator where they pass under the floor was large enough to admit a 25-cent coin, umbrella tips and a pocket-book. Defendant also knew that this same opening was large enough for a child's

fingers to be caught and mangled. Defendant had notice of accidents involving children's fingers being caught in this opening in 1952, two accidents in 1941 and 1942, and another in 1948. Furthermore, defendant knew as early as 1942 that the R-32 type of escalator was available with a much smaller opening and much narrower tread and that it would have cost only $9,000 to improve its M L model by changing the treads and comb plate. The duty of defendant in this regard is stated in Strobel v. Park, 292 Pa. 200 (1928), at page 205:

". . . An elevator owner *must keep pace with science*, art, and modern improvements in appliances; his *duty* to his passengers is to provide and make use of the *best and most approved machinery* and devices *in general practical use* for the safety of the passengers. . . ." (Italics supplied.)

And at pages 206-207:

"The *normal and probable acts of passengers must be anticipated*. The elevator hauls the old, *young*, sick, infirm, crippled and blind. The owner must know that at times a passenger may suddenly collapse, move or be pushed about, or otherwise get some part of his person outside the car while it is in motion; . . . These results are obvious and must be anticipated in the construction of the car; it must be so built that, if such results occur, the passenger will not be catapulted into the elevator shaft, or fall against its sides. The court did not err in submitting this question to the jury. . . . (Italics supplied.)

Plaintiffs' evidence showed that in 1954 when the minor-plaintiff was injured defendant had not made use of "the best and most approved machinery and devices in general practical use for the safety of its passengers". A comparison between the escalator used in the Murphy store and the newer and improved

model "R-32" shows, inter alia, that the aperture in the "M L" Murphy escalator in which the minor-plaintiff's fingers were mangled, is *four times larger* than the aperture in the improved "R-32" type escalator.

Defendant contends that if the minor-plaintiff was not a trespasser when he entered defendant's store, he became such when he sat down on the escalator. We disagree. The minor-plaintiff in this case was injured while in a part of defendant's store where business visitors were expected to be and not at some location where they were not impliedly invited. It must be borne in mind that while a business visitor,[3] plaintiff was less than five years of age, that the moving machinery of an escalator is very attractive to children and that defendant must be conclusively presumed to have had knowledge of this in view of the four similar accidents to children which occurred previously on this escalator.

It is true that in the Pennsylvania cases and the A. L. R. Annotations to which we have referred, the child when entering the store, was accompanied by an adult, frequently its parent, who was a business visitor. Our independent research has not revealed a case in which a child of tender years was injured on an escalator after entering a store unaccompanied by a business visitor. However, in the instant case the minor-plaintiff's companion was a boy 11 years old who, as stated, entered the store to look for a Christmas present for his sister. We think the latter clearly was a business visitor and that Allen, his younger

---

[3] Todd v. Lit Brothers, 381 Pa. 109 (1955); Connelly v. Kaufmann and Baer Company, 349 Pa. 261, 37 A. 2d 125 (1944); Kramer v. Meyer, 168 Pa. Superior Ct. 13 (1950). See Annotation: "Child —Invitee or Licensee," 44 A. L. R. 2d 1316-1339, for cases holding that children are "business visitors" who accompany other business visitors to stores and shops, etc. See also the annotation in 152 A. L. R. 555-570.

companion, who likewise entered the store to look at the toys, should also be classified as a business visitor and not a mere licensee or a trespasser. A business visitor is defined in A. L. I. Restatement of the Law of Torts §332, as:

"A business visitor is a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them."

In Levin v. Ohrbach's Inc., (1951), 14 N. J. Superior Ct. 193, 83 A. 2d 4, 44 A. L. R. 2d 1324, the court held that included in a merchant's *implied invitation* to enter his shop are persons who enter on business having a potentiality for pecuniary profit to the merchant.

In the case at bar the uncontradicted testimony of Florence S. Peffer, mother of the minor-plaintiff, was that on previous occasions she and her son Allen had visited the toy department of defendant, that she purchased clothing for Allen on the second floor and that the last time she and Allen visited defendant's store was about one or two weeks before the accident in question. It would be a reasonable presumption that Allen was acquainted with defendant's store and that he, together with his older companion, walked 16 blocks to defendant's premises because he was interested in looking at some of the merchandise. As one of a family of six children, all of whom except one were older than he and living with him, and several gainfully employed, it may be assumed that Allen's desire for toys would have been satisfied to some extent by his mother and his older brothers and sisters, thus constituting him a source of *potential profit* to defendant company which impliedly invited him to enter upon its premises. In Sears, Roebuck & Co. v. Donovan (1958), 137 A. 2d 716, D. C. Mun. App., the court

held that an adult daughter accompanying her mother who desired to purchase a rake was an "invitee" by reason of the implied invitation of the storekeeper and that she was a potential customer even though she did not intend to purchase anything when she entered the store.[4]

Under all the evidence we are of the opinion that Allen had a right to get on the escalator for the purpose of going to the second floor with his companion and should not be deemed in law to be a "trespasser" as defendant contends, merely because, child-like, he sat down on the moving steps and innocently left his hand drop to his side.

" 'A child of immature years is expected to exercise only such care as pertains to childhood, and all persons dealing with such a child are chargeable with such knowledge. As a result, one dealing with children is bound to exercise a greater amount of caution than he would were he dealing with an adult.' . . .

". . . 'We think the evidence in the case at bar was sufficient to warrant the jury in saying that the moving escalator was such an instrumentality as was likely to attract a small child's curiosity and likely to cause it to put its hand upon the moving step at the point where the opening was located and justified a finding that it presented a condition of such a dangerous nature to children of tender age that a reasonably prudent person, exercising ordinary care, would have anticipated such danger to a child and guarded against it.' . . .": Takashy Kataoka v. May Department Stores Co., 60 Cal. App. 2d 177, 140 P. 2d 467, 471 (1943), 44 A. L. R. 2d 1330. The child was not a passenger on the escalator.

---

[4] Crown Cork and Seal Company v. Kane, 213 Md. 152, 131 A. 2d 470; Prosser, Law of Torts (2d ed.), §78; Harper and James, the Law of Torts (1956 ed.), vol. 2, §27.12.

In Kramer v. Meyer, 168 Pa. Superior Ct. 13 (1950), 76 A. 2d 481, 44 A. L. R. 2d 1329, a five-year-old boy and his mother were in defendant's store to shop for clothing. Observing a small folding stepladder, the child climbed upon it and sat down. When he attempted to rise, the tip of one of his fingers was injured by being caught in the hinge of the ladder. The court was faced with the question of the status of a child who sits down upon a surface not normally used for sitting and not provided for customers to sit upon. The court held that the child was a business visitor but sustained the compulsory nonsuit on the ground that no negligence had been shown.

In Mills v. Lit Brothers, 347 Pa. 174, supra, a three and one half year old child wandered away from its mother while the latter was shopping in defendant's store and was found with its hand caught under the comb plate of an escalator. The child was treated as a "business visitor" even though he left his mother's company and placed his hand in such a position that it was drawn into the escalator. Recovery was denied because there was "not a scintilla of evidence" that defendant was negligent, its escalator being "a recent installation of modern design." Since the minor-plaintiff remained a business visitor in those cases, it follows that in the instant case Allen Peffer remained a business visitor after he sat down upon the moving escalator with his right hand in such a position that it was drawn under the comb plate at the exit landing. See also Burdine's Inc. v. McConnell, 146 Fla. 512, 1 So. 2d 462 (1941) ; Takashi Kataoka v. May Department Stores Co., supra.

Even though the minor-plaintiff had been a trespasser, we believe defendant, nevertheless, would have been subject to liability for bodily harm to him in view of all the circumstances in this case under the

rule set forth in the A. L. I. Restatement of the Law of Torts, §339:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if

"(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

"(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

"(d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

Section 339 of the Restatement, supra, has been emphatically approved by the Supreme Court of Pennsylvania in Dugan v. Pennsylvania Railroad Company, 387 Pa. 25 (1956). There, in an opinion written by Mr. Justice Chidsey, the court said, on page 31:

"To establish defendant's liability, the plaintiffs seek to bring the case within the rule set forth in §339 of the Restatement, Torts. This section of the Restatement supersedes and supplants the doctrine of 'attractive nuisance' and the 'playground rule': Thompson et al. v. Reading Company, 343 Pa. 585, 23 A. 2d 729; McGill et al. v. United States, 200 F. 2d 873 (C. A. 1952); Prosser on Torts, §77. It has been termed 'The best statement yet made' of the principles under which a possessor of land will be held liable to trespassing children for bodily harm caused by artificial conditions

maintained thereon: Prosser on Torts, supra, at p. 620. There can be no doubt that §339 has been adopted in toto by this Court and is the law in this State; it has been cited, with approval, numerous times by this Court. In Bartleson et al. v. Glen Alden Coal Company et al., 361 Pa. 519, 629, 64 A. 2d 846, Mr. Justice Linn said for this Court: '. . . To the extent that past cases are in conflict with the view of section 339 of the Restatement of the Law of Torts, which we have adopted, they are no longer authority. . . .' . . ." See also Professor Eldredge's discussion of tort liability to trespassers in Eldredges' Modern Tort Problems, 1941 Ed., p. 201; Harper & James, The Law of Torts (1956 Ed.), vol. 2, §27.12, p. 1482, footnote 26; Prosser, Law of Torts (2 Ed.), §76, p. 443; 65 C. J. S. §28, Negligence.

In the case at bar defendant company maintains that it does not come within the scope of A. L. I. Restatement of the Law of Torts §339, because the cost of remodeling its escalator would have been $9,000 in 1942 when the new type of escalator appeared on the market and $18,000 in the year 1954 when the accident occurred.

We think that the cost of remodeling defendant's escalator or installing a new one would not have imposed an undue hardship upon it in 1942 or thereafter. Defendant's business operations are conducted on an extensive scale not only in the City of Harrisburg but throughout various other sections of the United States. Since it chose to install an escalator 20 years ago, though not required to do so then or to maintain it now, it should keep pace with modern improvements for the safety of those children whom it invites, directly or by implication, to come into its store and use its escalator.

II. *Should evidence have been admitted of prior accidents to children on the escalator in question?* We

think it was proper to permit plaintiffs to show that prior accidents occurred on the escalator in question and that evidence thereof was brought to the attention of defendant Murphy Company at its home office and also to the manager of the Harrisburg store. The evidence disclosed that two years prior to the accident in the instant case similar injuries were suffered by a four-year-old boy, Michael P. Fitzgerald, on November 5, 1952, whose fingers became enmeshed and amputated on the escalator in question and that three other accidents of the same nature occurred on this escalator, as heretofore stated. We charged the jury on this point as follows:

". . . There has been introduced evidence of prior accidents on this same escalator. We say to you that prior accidents on the defendant's escalator do not in and of themselves establish the defendant Murphy Company's negligence. However, the jury may consider evidence of prior accidents on the defendant's escalator in determining whether the defendant had notice or knowledge of the alleged defect in its escalator and the likelihood of injuries therefrom."

We think evidence of prior accidents was properly admitted in view of the recent decision of the Supreme Court of Pennsylvania in Yoffee v. Pennsylvania Power & Light Company, 385 Pa. 520 (1956), where on page 542 the court, speaking through Mr. Justice Musmanno, quoted from Ringelebin v. Fidelity Trust Co., 330 Pa. 69, 71 (1933):

" 'Authorities are almost unanimous in holding that evidence of the occurrence of similar accidents is admissible for the purpose of establishing the character of the place where they occurred, their cause, and the imputation of notice, constructive at least, to the proprietors of the establishment, of the defect and the likelihood of injury.' " See also Fisher v. Pomeroy's

Inc., 322 Pa. 389, 391 (1936) ; McCarthy v. Ference, 358 Pa. 485, 497 (1948), and Hecht Co. v. Jacobsen, 180 F. 2d 13 (1950), United States Court of Appeals, District of Columbia Circuit. Hence, plaintiffs' evidence that children on four occasions injured their hands at the same place as plaintiff did on dates prior to the injuries sustained by Allen Peffer, is relevant and admissible.

III. *Should the court have admitted evidence of the use of a newer and improved model escalator in other stores in Harrisburg and elsewhere?*

We think it was proper to permit plaintiff to show that a newer and safer model escalator "R-32" was available to defendant company as early as 1942, 12 years before the accident in the instant case, which occurred November 17, 1954. As above stated, plaintiffs' evidence showed that at the time of the accident there were approximately 300 of the new type escalators "R-32" in use in Pennsylvania compared with 137 of the type used in the Murphy store. We believe that the jury was entitled to consider this evidence on the question of negligence. In Strobel v. Park, 292 Pa. 200 (1928), the court said, at page 204:

"If this was a necessary fact to be found to establish defendant's negligence, there was sufficient evidence from which the jury could find that it was customary to have collapsible doors or other protection in front of and encasing elevator cages. While it is true that the owner is not bound to furnish appliances which will make accidents impossible, and is only required to furnish those actually used by men of judgment and common prudence, yet if we assume plaintiff's evidence to be correct, as we must, defendant failed in his duty to the passengers. *When a recognized standard of comparison (namely, other elevators) is present, it furnishes the basis for concluding that defendant was negligent.*" (Italics supplied.)

Furthermore, we think the jury was entitled to consider evidence that the newer type of escalator, "R-32", when carrying two passengers, can be stopped in four to five *inches* while it required four and one-half *feet* to stop defendant's old type escalator. Plaintiff's evidence thus showed that defendant's escalator did not have the safeguards used in the majority of escalators in Pennsylvania. With respect to the evidence of a later and improved model, we charged the jury as follows:

"There was also introduced evidence of a later or improved model of escalators which was referred to as Model R-32. You will have that model out with you as well as, I think it is, Plaintiff's Exhibit Number 1, which is the model of the escalator now in use at the Murphy Store. With respect to the evidence regarding the later or alleged improved Model R-32, we say to you that the failure or omission of the defendant Murphy Company to install the more modern or up-to-date escalator when the same came on the market is *not*, of itself, *an act of negligence* unless it appears from a fair preponderance of the evidence that a person exercising the highest degree of care, skill and foresight *within reason* for the safe carriage of his passengers would supplant the old installation with the new and would not continue to use the old installation because of the hazards to its passengers."

We see no error in these instructions. In 2 Wigmore on Evidence, §461, p. 489, that learned author states:

"This conduct of others, then, (1) is receivable as *some evidence of the nature of the thing in question*, because it indicates what is the influence of the thing on the ordinary person in that situation; but (2) it is *not to be taken as fixing a legal standard for the conduct* required by law.

"This distinction is patent enough, but it is sometimes judicially ignored, in that the evidence is ex-

cluded on the erroneous supposition that the mere reception of it implies that it is to serve as a legal standard of conduct. *The proper method is to receive it, with an express caution that it is merely evidential and is not to serve as a legal standard. . . . .*" (Italics supplied.)

And at page 490 Wigmore cites Mr. Justice Holmes' oft quoted declaration in Texas and Pacific Railway Company v. Behymer, 189 U. S. 468 (1903) :

"What usually is done may be evidence of what ought to be done; but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not." See also Hecht Co. v. Jacobsen, 180 F. 2d 13, 17 (1950), supra.

Since plaintiffs here allege that defendant breached its duty, it follows that plaintiffs' evidence that there were newer and improved "R-32" escalators and that they outnumbered the M L type by 300 to 137 in Pennsylvania in 1954 is admissible to present to the jury a standard of comparison, a standard which defendant could have attained but did not. As in the Strobel case, plaintiffs here showed that the larger number of escalators were equipped with safety features not found in defendant's escalator. These safety features were, inter alia, the narrower opening between the treads of the steps and the comb plate and the improved brakes. The vertical distance between the bottom of the prongs of the comb plate and the bottom of the grooves of the step on the M L type (Murphy store) escalator is 12/32 inch to 18/32 inch while on the new model "R-32" it is 3/32 to 4/32 inch; the vertical distance between the bottom of the comb plate web and the top of the treads or ribs on the M L model is 12/32 inch and on the new type "R-32" it is 4/32 inch; the width of the space in the gulley between the steps as they become flush before going beneath the comb plate on

the M L model is 5/8 inch while on the "R-32" it is 1/8 inch; the horizontal distance between the ribs on the step on the M L model is 29/64 inch and on the "R-32" it is 14/64 inch.

With respect to the distance in which the respective escalators travel after the stop button is pushed, the evidence disclosed that in the M L escalator the distance was *nine feet* as compared to *five* to six *inches* on the new type "R-32" when the escalator was empty, and when there were two passengers the stopping distance for the M L escalator is four and one-half *feet* and for the new type "R-32" it is four to five *inches,* as above stated.

IV. *Should the witness Wolfe have been permitted to testify as to the cost of remodeling the escalator?*

We think there was no error in admitting Wolfe's testimony that defendant's escalator could have been remodeled in 1942 for $9,000. This witness is a mechanical engineer who graduated from the engineering school of the University of Virginia in 1934 and has engaged in the practice of his profession and as a consultant to this date. He was sent to Harrisburg in 1939 on several occasions by defendant to oversee the installation of the escalator. Thereafter defendant placed him in charge of the air conditioning of its Harrisburg store, the maintenance of the escalator and its mechanical repair. Mr. Wolfe had knowledge of accidents to children on the escalator in 1941 and 1942; he was an eye witness to the latter and stopped the moving mechanism. Thereafter he wrote to the home office of the company at McKeesport, advising his superiors of the accident and informed them that a new type escalator was available with a smaller comb plate and a smaller tread and that defendant's escalator then in use could be remodeled to conform with the improved type at a cost of $9,000.

We believe that under all the evidence Mr. Wolfe was familiar with the cost of remodeling the escalator in question and that he was amply qualified by professional training, knowledge and experience to testify in regard thereto.

And now, January 5, 1959, defendant's motion for a new trial is overruled and judgment is directed to be entered upon the verdict.